UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————

TACARA WINDOM,

                              Plaintiff,

          -vs-                            **No. 6:14-CV-06652 (MAT)**
                                          **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                              Defendant.

———————————————————————————

## I.   Introduction

     Represented by counsel, Tacara Windom ("plaintiff") brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, plaintiff's motion is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

## II.  Procedural History

     The record reveals that in October 2012, plaintiff (d/o/b February 8, 1984) applied for SSI, alleging disability as of September 1, 2004. After her application was denied, plaintiff requested a hearing, which was held before Administrative Law Judge

Brian Kane ("the ALJ") on May 22, 2014. The ALJ issued an unfavorable decision on June 25, 2014. The Appeals Council denied review of that decision and this timely action followed.

## III. Summary of Evidence

The administrative record details plaintiff's mental health treatment. The earliest mental health treatment note in the record is from July 8, 2012, when plaintiff's husband called the Comprehensive Psychiatric Emergency Program ("CPEP") ward of Strong Hospital and reported that plaintiff had a history of depression and that he was concerned about her due to recent behavior. Plaintiff's sister called police to check on plaintiff's welfare, reporting that plaintiff had been "saying her goodbyes to everyone" and had stated she planned to jump off a bridge. T. 308. When plaintiff's sister had spoken to plaintiff, plaintiff was crying and located on a bridge. Plaintiff was brought to the hospital for mental health admission, and presented as "very irritable and not willing to be forthcoming with information." T. 309. She stated that she had never been on a bridge, never called her sister, and had "no idea of why her sister would call and do this to her." Id. It was noted that plaintiff had a documented history of bipolar disorder, not otherwise specified ("NOS"). Plaintiff was discharged that day, "[g]iven [her] current presentation and based on collaterals from [her] husband, as well as [the] fact that

[plaintiff] [did] not demonstrate significant risk acute safety to self or others." T. 312.

Aside from the July 8, 2012 incident, medical evidence consists mainly of plaintiff's medical treatment with Dr. Assaf Yosha at Woodward Health Center ("Woodward") and treatment at the Behavioral Health Department of Catholic Family Services ("CFS"). The medical records reveal various mental health diagnoses including depressive disorder, bipolar disorder, and post-traumatic stress disorder ("PTSD"). Treatment notes from Dr. Yosha consistently noted abonormalities in mental status examinations. During her treatment at Woodward, which spanned the time period from July 2012 through March 2014, plaintiff was consistently noted as reporting and demonstrating flat and depressed affect. She also repeatedly reported suicidal ideation (see, e.g., T. 320, 610) and exhibited problems complying with prescribed medication. In February 2014, Dr. Yosha noted that her primary "[b]arriers to care" were depression, mistrust of medications, and frustrations with lack of positive effect in dietary and exercise changes. T. 422.

Plaintiff also treated at CFS, from approximately July 2012 through August 2013. The record then shows a gap in treatment at CFS, and a letter dated May 27, 2014 from CFS stating that plaintiff had re-engaged in treatment and would be treating on a weekly basis. Plaintiff's treatment at CFS revealed consistent

abnormalities on mental status examination ("MSE"), such as depressed and sad affect, slow and difficult speech, lethargy, and low energy. Plaintiff reported a history of bipolar disorder and PTSD, as well as a history of attendant manic episodes and panic attacks. Her global assessment of functioning ("GAF") was consistently rated in a range indicating serious symptoms (such as suicidal ideation) or a serious impairment in social or occupational functioning. See T. 372 (GAF score of 47 on July 25, 2012); 580 (GAF score of 47 on May 14, 2013); 375 (GAF score of 42 on August 19, 2013); see generally Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders–Text Revision ("DSM–IV–TR"), at 34 (4th ed., rev. 2000).

In May 2013, Leticia Alston, LMSW, one of plaintiff's treating providers at CFS, completed a psychological assessment for determination of employability for Monroe County Department of Social Services ("MCDSS"). Alston noted that plaintiff had made frequent suicide attempts and had a history of psychosis. According to Alston, plaintiff was moderately limited in maintaining attention and concentration, as well as regularly maintaining a routine schedule, and she would be able to work for only 10 hours per week with reasonable accommodations, including low-stress environments and small social settings. Alston opined that these limitations would last for 6 months, yet also stated that she had seen plaintiff for treatment only once on May 14, 2013, so her

4

progress could not be determined at that time.[1] Alston thus based her assessment primarily on her review of plaintiff's past treatment at CFS.

The record also contains several reports of consulting examinations. In September 2012, Dr. Yu-Ying Lin completed a psychological and intellectual assessment for determination of employability with MCDSS. Plaintiff reported a history of bipolar and post-traumatic stress disorders, as well as a history of panic attacks and four suicide attempts, three of which she stated had resulted in hospitalization. On MSE, plaintiff demonstrated dysthymic mood and affect; impaired attention and concentration in that she was unable to perform serial 3's backward and perform simple multiplication; moderate impairment in recent and remote memory; below average to borderline cognitive functioning; and fair judgment. On Axis I, Dr. Lin diagnosed plaintiff with bipolar disorder, NOS, generalized anxiety disorder, PTSD, and cannabis abuse. He opined that she would be moderately limited in following, understanding, and remembering simple instructions; maintaining attention and concentration; and using public transportation; and very limited in performing complex tasks independently and performing low stress and simple tasks. Dr. Lin opined that, for a

---

[1] The Court notes that earlier treatment notes from CFS reflect that, prior to her treatment with Alston, plaintiff treated primarily at CFS with Yao-Szu Tsou, LMSW.

period of six months, plaintiff would be "unable to participate in any activities except treatment or rehabilitation." T. 576.

Dr. Christine Ransom, Ph.D. completed a psychiatric evaluation, at the request of the state agency, in December 2012. Plaintiff reported anxiety, depression, and PTSD secondary to childhood sexual abuse. She reported that she spent most of her day "sleeping off and on," but that she was able to take care of her children and complete daily household chores. T. 672. On MSE, plaintiff exhibited slow and halting speech; moderately to markedly dysphoric and tense quality of voice; coherent and goal-directed thought processes; moderately to markedly dysphoric and tense affect and mood; clear sensorium; orientation to person, place, and time; moderately impaired attention and concentration; moderately impaired recent and remote memory; borderline cognitive functioning; and "adequate" insight and judgment "as she would like to get into treatment." T. 673.

According to Dr. Ransom, plaintiff would have "moderate difficulty following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration for simple tasks, maintaining a simple regular schedule and learning simple new tasks"; and she would have moderate to marked difficulty "performing complex tasks, relating adequately with others and appropriately dealing with stress." Id. Plaintiff's "[a]reas of difficulty [were] secondary to [PTSD],

6

currently moderate to marked; psychotic depression, currently moderate to marked; generalized anxiety disorder; currently moderate[;] and panic disorder with agoraphobia, currently moderate." T. 673-74.

In January 2013, state agency psychologist Dr. A. Hochberg reviewed the available evidence and opined that plaintiff "retain[ed] the ability to sustain simple work on a sustained basis." T. 99.

Another psychiatric consultation was completed by Dr. Adam Brownfield in November 2013. Reporting on a mental status examination, Dr. Brownfield did not note abnormal mood or affect symptoms, but opined that plaintiff's attention and concentration were "[m]ildly impaired due to emotional distress secondary to psychosis and depression"; her recent and remote memory were impaired similarly; and cognitive functioning was noted to be in the below average to borderline range. Dr. Brownfield opined that plaintiff had "[n]o evidence of limitation in following and understanding simple directions and instructions, or performing simple tasks independently"; she was "mildly limited in maintaining attention and concentration, maintaining a regular schedule, learning new tasks, and performing complex tasks independently, but [did] not require supervision, and relating adequately with others"; she was moderately limited in making appropriate decisions; and she was moderately to markedly limited in

7

appropriately dealing with stress "given her numerous psychiatric hospitalizations." T. 348.

At her hearing, plaintiff testified that she worked two to four hours a day in an after school program job assignment through MCDSS. She testified that her supervisor thought she was doing a good job, but that he "[got] worried that [she went] in the bathroom and [cried] sometimes." T. 45. She stated that she had done this several times in the last three months, but that she "[tried] to limit [her]self so [she was not] obvious." T. 46. Plaintiff testified that she had a coworker cover for her if she had emotional difficulty. She also testified that she had worked at a department store shoe department for two months in the past, but that she was placed in the back shoe room because "they didn't want to put [her] up front" due to her "emotional problems." T. 49. Plaintiff testified that one incident with a customer had resulted in her leaving work and going to a bridge, from which she called her sister reporting suicidal thoughts. Plaintiff testified that she cared for her children by feeding them and putting them on the bus to school, but that sometimes her husband would have to take over because she could not get out of bed.

Vocational expert ("VE") Julie Andrews testified that a person with no exertional limitations who could engage in "occasional contact with coworkers and occasional contact with the general public," as well as "simple work requiring SVP-4 or below" and was

not capable of repetitive industrial processes, could perform plaintiff's past relevant work as a "shoe handler," as she performed it. T. 65-66. VE Andrews also testified that such a person could perform the occupations of industrial cleaner (unskilled, SVP-2, medium work) and agricultural produce sorter (unskilled, SVP-2, light work). When asked whether this same person, with the added limitation of an ability to "only occasionally deal with the stress of employment," could perform these jobs, VE Andrews responded that such an individual would not be able to perform any jobs in the national economy.

## IV.  The ALJ's Decision

The ALJ followed the well-established five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since October 16, 2012, the application date. At step two, the ALJ found that plaintiff suffered from the following severe impairments: depressive disorder and bipolar disorder. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

Before proceeding to step four, the ALJ determined that plaintiff retained the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations:

she could have only occasional contact with the general public and coworkers; she could engage only in simple work requiring "specific vocational preparation level" four or below; and she could understand and carry out simple unskilled work, but was not capable of repetitive industrial processes (i.e., she could not perform fast-paced work). At step four, the ALJ determined that plaintiff was capable of performing past relevant work as a shoe handler. Alternately, at step five, the ALJ found that considering plaintiff's age, work experience, and RFC, jobs existed in significant numbers in the national economy that plaintiff could perform. The ALJ thus found that plaintiff was not disabled.

## V.   Discussion

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

### A.   RFC

Plaintiff contends that the ALJ erroneously determined plaintiff's RFC, given the fact that he gave "great weight" to the opinion of Dr. Ransom, who, plaintiff argues, found that plaintiff

had limitations more restrictive than those outlined in the RFC. The Commissioner counters that the ALJ was entitled to weigh the evidence of record, and to resolve conflicts in the evidence, specifically conflicts between the consulting medical opinions. The ALJ gave great weight to the opinions of Drs. Ransom, Brownfield, and Hochfield. Both Drs. Ransom and Brownfield actually examined plaintiff, whereas Dr. Hochfield merely reviewed the evidence and simply opined that plaintiff was capable of sustaining "simple work on a sustained basis." T. 99.

As noted above, Dr. Ransom found that plaintiff would have moderate limitations in following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration for simple tasks, maintaining a simple regular schedule, and learning simple new tasks. Additionally, Dr. Ransom opined that plaintiff would have *moderate to marked* difficulty "performing complex tasks, relating adequately with others and appropriately dealing with stress." T. 673. Dr. Brownfield opined that plaintiff had no limitations in following and understanding simple directions and instructions, or performing simple tasks independently, and that she was "mildly limited in maintaining attention and concentration, maintaining a regular schedule, learning new tasks, and performing complex tasks independently, but [did] not require supervision, and relating adequately with others." T. 348. However, Dr. Brownfield further

11

found that plaintiff was moderately limited in making appropriate decisions and she was *moderately to markedly* limited in appropriately dealing with stress "given her numerous psychiatric hospitalizations." T. 348.

As described above, the nonexertional limitations the ALJ incorporated into his RFC finding were as follows: she could have only occasional contact with the general public and coworkers; she could engage only in simple work requiring "specific vocational preparation level" four or below; and she could understand and carry out simple unskilled work, but was not capable of repetitive industrial processes (i.e., she could not perform fast-paced work).

"Because stress is highly individualized, mentally impaired individuals may have difficulty meeting the requirements of even so-called low-stress jobs, and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work." Stadler v. Barnhart, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006) (internal quotation marks omitted) (citing SSR 85-15); Welch v. Chater, 923 F. Supp. 17, 21 (W.D.N.Y. 1996) ("Although a particular job may appear to involve little stress, it may, in fact, be stressful and beyond the capabilities of an individual with particular mental impairments").

Thus, the ALJ's RFC assessment did not properly account for plaintiff's moderate to marked limitations in dealing with stress,

which both Drs. Ransom and Brownfield noted, and which opinions were amply supported by record evidence and accordingly were given great weight by the ALJ. This omission was not harmless, as the VE actually testified that an individual with the ALJ's prescribed RFC, but who also had the ability to "only occasionally deal with the stress of employment," could not perform any work.

In this case, no treating physician opinion is present and two consulting psychiatrists found "moderate to marked" limitations in dealing with stress. Additionally, ample record evidence indicates a history of anxiety, depression, and bipolar-related symptoms wherein a work-related incident led to plaintiff's most recent suicide attempt. Under these circumstances, the Court finds that the record does not contain substantial evidence to support the ALJ's RFC finding because it does not adequately address plaintiff's specific functional limitations regarding stress. See, e.g., Lancellotta v. Sec'y of Health and Human Servs., 806 F.2d 284, 285 (1st Cir. 1986) (reversing and remanding where "[t]he ALJ made no findings on the nature of Lancellotta's stress, the circumstances that trigger it, or how those factors affect his ability to work"); Smith v. Astrue, 2011 WL 6739509, *7 (N.D.N.Y. Nov. 4, 2011) ("The ALJ did not make sufficient findings concerning Plaintiff's particularized ability to deal with stress, other than to generically conclude that she was limited to 'low stress' work."); Stadler, 464 F. Supp. at 189; Welch, 923 F. Supp. at 21;

cf. <u>Davis v. Comm'r, Soc. Sec. Admin.</u>, 2013 WL 1124589, *3 (D. Md. Mar. 18, 2013) (holding that RFC finding specifying "low stress" was adequate only because this term had been sufficiently described to the VE when presenting a hypothetical).

On remand, the ALJ should order, as he deems necessary, additional treating or consulting opinions describing plaintiff's functional ability to handle stress in a work environment. The ALJ should also re-contact a VE in order to pose appropriate hypotheticals that accurately account for plaintiff's ability to handle stress, such that a proper determination can be made regarding plaintiff's RFC.

**B.   Step Five Finding**

Plaintiff contends that the ALJ's finding (and incorporation into the VE hypothetical) that plaintiff could perform specific vocational preparation ("SVP") level four work is inconsistent with his ultimate RFC finding that plaintiff could perform only simple, unskilled work. Consequently, plaintiff argues, VE testimony was elicited in response to an unsupported hypothetical question, which involved an individual with an SVP level of four or below. The Court agrees that the RFC finding is confusing and arguably internally inconsistent, and further finds that the ALJ's finding

14

that plaintiff could perform at SVP level four was unsupported by substantial evidence.[2]

SVP level work at levels three and four corresponds to semi-skilled work, whereas SVP level work at levels one and two correspond to unskilled work. See SSR 00-4p. The ALJ's finding that plaintiff could perform only simple work at SVP four or below conflicts with Dr. Ransom's assessment that plaintiff would be moderately limited even in performing such work, and with Dr. Brownfield's opinion that plaintiff would have limitations in performing any work beyond the simple, unskilled level. Thus, on remand, the ALJ is directed to reconsider plaintiff's SVP level in posing any hypotheticals to the VE, and to accurately incorporate any findings regarding this SVP level into his RFC finding.

## C. Credibility

Plaintiff contends that the ALJ erred in considering plaintiff's credibility. Because the ALJ's credibility finding turned largely on his conclusion that "[t]he residual functional capacity outlined [in the opinion] account[ed] for those vocational

---

[2] The Court disagrees with the Commissioner's characterization that plaintiff's "argument is specious because an individual who can perform SVP 4 (semi-skilled) work can also logically perform less demanding 'simple unskilled work[.]'" Doc. 12-1 at 28. Although that may be true, the ALJ's RFC finding explicitly stated that plaintiff was capable of performing work at SVP level four or below, which finding, for the reasons stated herein, was unsupported by substantial record evidence. Arguably, the ALJ's RFC finding is inconsistent in concluding that plaintiff could perform not only simple, unskilled work, but also any work at SVP level four or below.

limitations that her conditions would place on her" (T. 29), the Court directs the ALJ to reconsider and reevaluate plaintiff's credibility on remand, after arriving at a proper RFC determination consistent with the record and this Decision and Order.

## VI.  Conclusion

For the foregoing reasons, the Commissioner's cross-motion for judgment on the pleadings (Doc. 12) is denied and plaintiff's motion (Doc. 10) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

**S/Michael A. Telesca**
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     December 15, 2015
           Rochester, New York.